There are three main reasons why Mr. Sayre's security fraud conviction should be overturned. And the first is that, actually they're all related, the district court declined to give Mr. Sayre's requested instruction on defining materiality based on the cases of U.S. Supreme Court Basic v. Levinson and TSC v. Northway, such that a reasonable investor would have viewed the omitted information or the failure to disclose as having substantially altered the total mix of information available. That was Mr. Sayre's defense, and the government did not dispute that the total mix of information available about the company he was writing about, eConnect, was uniformly the same. The district court instead relied on primarily a 1970s case called Zweig v. Harst, which has effectively been overruled by both Chiarella and Basic v. Levinson. And third, the district court declined to give an instruction defining what a reasonable investor is, even though a reasonable investor is not a term that is common to the ordinary experience of a juror. And the juror, excuse me, the investor that was called by the government in this case was not a reasonable investor under any standard. And for those three reasons, Mr. Sayre's conviction should be overturned. Now, I realize that there have been a number of Ninth Circuit cases on both sides. There are a number of cases which correctly recite the materiality standard from Basic and TSC v. Northway and use the total mix language. And there are a number of cases where that total mix language has been left out. But those cases, the issue of whether or not the total mix language should have been included in the jury instruction was really not an issue in those cases. And there's also the fact of the Ninth Circuit pattern jury instruction does not include the total mix language. And to the extent that the pattern jury instruction leaves that out, it's deficient and it should be fixed. Going on to Swig v. Harst, that case has clearly been overruled by the United States Supreme Court. And I think it's important to officially recognize that. First, the columnist that was held liable, and that was a civil case, this court, a divided court, relied on Supreme Court because Chiarella and, indeed, the columnist was not a fiduciary and had no fiduciary duties. But second of all, in that Swig v. Harst case, the dissent pointed out that there was, in fact, no reliance by the plaintiff on the columnist's column and his failures to disclose that they had, in fact, decided to buy that stuff well before his column appeared and for a, you know, they were not relying on it. And Basic v. Levinson says that, you know, you can, there is a rebuttable presumption that you can, if you can show that the plaintiff or whatever did not rely on this failure to disclose, then there isn't any liability there. And third, to go into the reasonable investor, the investor in this particular case admitted that only a couple of weeks before she bought eConnect stock that she didn't know anything about the stock market and she was just kind of getting started. But even if within that very short period of time that she decided she wanted to start investing in the stock market and that she had learned a lot of things about the stock market, the most significant thing is that when she purchased the eConnect stock, she did not understand what a market order was. And that is the most simple trade in the people buying and selling stock is a market order. It is not something that's going to be filled immediately. It will be filled as soon as possible and at whatever price. And she wasn't paying attention to the price. And if somebody is not paying attention to the price, they're not a reasonable investor. But in any event, she was not a reasonable investor. And the overall Mr. Sayre's defense was that the total mix of information available was the – let me backtrack – that failure to disclose did not significantly alter in any way the total mix of information available about this company, eConnect. And therefore – and because it was his defense, because the government did not dispute that in fact the evidence – that there was the total mix of information available supported his defense. And the fact that the United States Supreme Court has held in both of these basic NTSC versus Northway that that is the materiality standard, Mr. Sayre's conviction should be reversed. Those cases don't actually really say that that is the materiality standard. The cases actually say that the materiality standard is what would be considered important in making a decision by the reasonable investor. And they use the total mix of information as kind of an alternative way of asking that same question. But that being said, don't you think it would have been an important thing to know, if you're reading the IFR opinions that were distributed by your client, that he actually had a conflict of interest in promoting the stock when he himself had bought it and was trying to sell it and profit off of people acting on his reports? No, because would a reasonable investor care about something like that? I think a reasonable investor is going to be somebody that wants to know, what is this company doing that I am buying stock in? And what is all the other pundits, so to speak, saying about it? Yeah, and all the other – the evidence showed that all the other evidence came – or all the other mix of information in the marketplace came from E-Connect, which had an equally strong interest in promoting the value of its stock. No, because a reasonable investor might assume, for example, that – let's just say there's a lot of other Internet articles which there were uniformly – What were the sources of those articles? Council, what were the sources of those articles? There were – I think it was called barchart.com. And what was that company's relationship with E-Connect? These are – a lot of them are – I mean, I'm not personally an expert in the stock market, but the government did not dispute that there was a lot of Internet activity, a lot of people posting notices on the Internet about this E-Connect stock. And there was – the government did not produce any information that was publicly available about E-Connect that said anything different. And one could assume that a lot of the other people who wrote articles about E-Connect stock and were all relying upon what E-Connect said about itself, that some of these people may well have been buying and selling stock. Put it another way, had there been a disclosure, for example, I think that E-Connect stock is so great that I went out and bought a whole bunch of that myself. Would that significantly alter the total mix of information available? No, it would not. And so if Mr. Sayre, for example, had said things about E-Connect itself that were false and that he knew that they were false and so on and so forth, that would certainly be important to the reasonable investor. But whether or not somebody is buying and selling that stock, he wasn't a fiduciary, he wasn't a financial analyst, and he was not a member of that – he was not insider trading. So that is why the fact that he didn't disclose that he was for another company buying and selling the stock. Another company which he wholly owned. I'm sorry? Another company which he wholly owned. You know, there's a lot of things that people ought to know, but is it under the grand scheme of things? Is it too much information? Is it really important to a reasonable investor? And is that why somebody would buy the stock? Would you buy and sell stock simply because somebody said I'm not buying it myself? I think it's a great buy, but I'm not buying it. I mean, that's, I think, the issue. Well, what about the statement IFR holds no stock in E-C-N-C? Why include that at all if you didn't think it was important? I'm sorry, I couldn't hear you. Why include the statement in the IF reports that IFR holds no stock in E-C-N-C if one didn't think it was important that there be an independent relationship between the person who was giving purportedly objective advice? Well, again, there are any number of statements that may not, you know, say, well, it would have been nice if you had said, you know, totally the truth or something like that. For example, in that Bingham case where the, I believe his name was Bingham, he was buying and selling stock in the deceased's, the name of somebody who had died. He wasn't, you know, and that was a huge lie. And this court said, but it's not enough because it doesn't alter the total mix of information available. If you had known that he was buying and selling it in the false name, would it have changed a reasonable investor's mind about whether to purchase that stock? Well, what about the fourth opinion, which in fact caused the investor who testified to purchase, that states E-Connect is very quickly rising to the target of $12 a share by March 8, 2000, and it's dated March 8, 2000, and should easily reach $20 to $25 a share in the very short term? I'm sorry, I'm not, I didn't quite understand what you mean. I'm quoting the statement from this, which is making a representation about E-Connect. But I think that those are not statements that were false. The only statement that was alleged by the government to be a failure to disclose. Was the relationship. Is the fact that he himself was buying the stock in another company. And that's the only statement that was considered to be false. And in fact, it was not actually false because it was for a different company. But that is the only thing that the government alleged, which was a failure to disclose. And that's the problem here. The government, and the government did not, the government in fact conceded that they were not even arguing that anything written in those IFR reports had any effect on the market whatsoever. And they conceded that, they did not argue that. And that's the issue here, is that solely that one, that's one statement regarding the failure to disclose. And that's the problem. And everything else about the company was repeated in other internet articles. And the government did not allege that that was false or misleading. If there are no other questions, I'll save the rest of my time for rebuttal. Thank you, counsel. Thank you. May it please the court. Mr. Robinson on behalf of the plaintiff of the United States. Now, Judge Warlaw, I think the court quite properly focused on a clear aspect of this case, which is that the scheme which was charged in this case is a scalping scheme. And in a scalping scheme, what is false, what is misleading, is the presentation by the defendant in his March 8, 2000 IFR opinion, that the opinion was coming from an independent objective source, that it was not being compensated, and would receive no compensation for rendering that opinion. And moreover, contrary to what my opponent has just said, that particular opinion on March 8th, which is the subject of the count of conviction, count 3, also had some additional information that was not in the prior. I mean, it omitted some material information that was not alleged with respect to the prior two opinions. Namely, that at the time the defendant issued the March 8th opinion, he had previously issued two opinions on the 20th of February and the 1st of March. Again, counting the stock of Econet. He had sold 80,000 shares in the interim after issuing those two prior opinions, had made a profit of over $200,000, sold 90,000 shares, made $200,000 of profit, bought an additional 100,000 shares in the interim before March 8th, issued his opinion the morning of March 8th, and later that same day, as the price of the stock was going up, attempted to sell all those shares. Contrary to the advice in his March 8th opinion, that Econet stock would be rising and would be a good short and long-term investment. So what was misleading about the March 8th opinion was not simply the portrayal of a lack of conflict of interest, the portrayal of an objectivity. It was also recommending a stock for long-term holding when the defendant, in fact, was trading against his own advice and had traded just a few days before profitably for it. That is the difference between the count of conviction and what's related to the March 8th opinion. Now, in a scalping case, the focus is on whether or not the opinion or the recommendation of the stock was contrary to the conduct of the individual making the recommendation. Here, the defense suggested that somehow, by looking at the totality of circumstances, the jury could conclude that the misrepresentations and omissions in the March 8th opinion were not material. The defense also contended that if a reasonable investor exercising due diligence looked at the totality of those circumstances, the investor would not be persuaded that those misstatements or omissions were material. But I submit to you that defies common sense. First of all, no amount of diligence would have enabled an investor to uncover the defendant's fraudulent scalping scheme. No amount of due diligence would have enabled a reasonable investor to determine that the defendant, who was trading in a nominee name, Silver Screen Industries, was in fact trading against his own advice. So the notion that there needed to be an instruction in this case that a reasonable investor is the one who engages in due diligence, there's no need for an instruction like that, and the trial court did not err in declining it. There's no case law that says that a reasonable investor instruction is appropriate in a case of this nature. Moreover, the position the defendant is taking essentially is that there is no such offense as scalping. Defendant's position is as long as other parties are favorably touting a company, then an individual is free to scalp because everybody else is talking positively. Well, on that point, what evidence did the government submit as to the source of the other information that was out in the market about eConnect? Your Honor, that is an excellent point because the government cross-examined the two witnesses that the defense called on this issue of what the total mix of information was, and the defense presented a compilation they called the Total Mix Exhibit, which was supposed to be essentially a category of all the other press releases, news articles, and the like about eConnect during the relevant time period. And on cross-examination, both of those witnesses for the defense admitted that unlike any other public available information about eConnect, the IFR opinion of defendants stood out because, first of all, it expressly stated it was an investment opinion. There was no other release out there that said it was an investment opinion. It said it was independent and there would be no compensation for the opinion. Nothing else out there in the Total Mix of Information said that. It said it made specific predictions about increasing prices in the short term and the long term. No other article about the company said anything of that nature. So, indeed, the only person in the Total Mix of Information who was giving a specific recommendation about eConnect stock rising and portraying that recommendation as coming from an objective source who was not being compensated was the defendant. And what exactly is eConnect and what happened to it? eConnect was a startup business, a tech business. In the record and in evidence was an article that at the time that these opinions were coming out, its latest financial report indicated it had only made $40,000 in the previous year and had not made any money in the past. And that is another point I'd like to touch on, Your Honor, because the president of eConnect at the time that this investment opinion of defendants was released testified at trial. And he testified that when the IFR opinions came out, he and the people at eConnect were very excited about them because they were touting the company. He was not aware that the person who was authoring them was trading in the stock. And because he viewed them to be so positive, he, the president of the company, Thomas Hughes, had his company widely disseminate that opinion, the IFR opinion, to the public. And he was asked, Mr. Hughes was asked during his examination whether he knew that Mr. Sayre was trading in the stock. He said, absolutely not. He was asked if he would have known that the person who was the author of the IFR opinion was trading in the stock, what would he have done? And he said, eConnect would have immediately issued a press release to avoid having the public deceived in relying on that IFR opinion. Frankly, I submit, how could a reasonable investor not view that false and misleading opinion, which is the subject of this kind of conviction, as anything but material? I have one last question. Would it have been error for the court to fashion a total mix instruction based on TSC and BASIC? It was with, I submit, Your Honor, that the instruction which the court did give adequately addressed the elements of the offense as required by TSC and BASIC. It was the model Ninth Circuit instruction. Yes, it tracked the model Ninth Circuit instruction from 2003, and indeed it's the same as the instruction that the Ninth Circuit recently issued in July of last year, which now includes the reasonable investor standard that the court incorporated in its instruction. The government's view is that the articulation of the total mix standard does appear, that language does appear in TSC and BASIC. But, for example, in TSC, after the court articulates what we consider to be the core standard, that a reasonable investor would find the information material, that there's a substantial likelihood that they would, says, put another way, and then gives the language about total mix. Similarly, in BASIC, after the court articulates that same standard about a reasonable investor, the court says, for example, and then it gives the total mix language. So it is an alternative expression. No court has ever held that an instruction that fails to include total mix is legally deficient. Well, it's not just total mix. The two sentences are, they both cover the concept of total mix, because the first sentence says, under all of the circumstances, and that's omitted also. So that's similar to total mix, so that the second sentence is a restatement of the first, and they both include the concept of total mix, and both of those, both sentences, omit that concept. Well, Your Honor, I would also say that the defendant in this case was not harmed by the failure to give the total mix instruction, because as the court in Bachman reasoned, the concept of a reasonable investor includes an investor who would take into account all available information. And in that case, the Bachman court rejected the argument. That was a First Circuit case we cited, rejected the notion that the total mix language has to be in a jury instruction or it's erroneous. In this case, the district court also told the defendant that he was free to argue the total mix of facts in support of his defense. Unless the court has any further questions, I'll submit. Briefly, I want to emphasize that the government did not allege that this was a scalping case. The government did not use the word scalping at all during the trial. It's only in the government's answering briefing here today that the government argues scalping. The government specifically said the issue in this case is securities fraud with respect to the investment opinions issued by Mr. Sayre in the name of IFR. It is not that his trading in the sense of buying and selling E-Connect stock in the Silver Screen account itself caused a market manipulation. That's at 2ER388. Continuing on, he said, We have never claimed, it is not in the indictment, we have never claimed that his purchase and sales of shares separate and apart from the opinions caused a market manipulation. The government was later asked by the court, is the government going to argue that the IFR reports caused the stock prices to go up? Answer, no, Your Honor, we have never argued it was a cause. We haven't tried to establish through any empirical evidence a causal link that a certain press release or a certain opinion caused a certain price and a change of stock, and that's at 2ER507. And the government never used the word scalping. So the issue is, is the failure to give an instruction that was based on the United States Supreme Court settled law that was part of Mr. Sayre's defense, did that make a difference in how the jury evaluated the evidence? He was only convicted on one of the three counts. It certainly did. And Mr. Sayre's conviction should be reversed because he was not – he was entitled to the instruction that he requested. Thank you. Thank you, counsel. The case to be submitted, final case of the day.
judges: Fletcher B. , Reinhardt, Wardlaw